Harmony Rockaway LLC, Plaintiff,

against
Mark Gelwan, M.D., IRA BACHMAN, M.D. ANTHONY HORVATH, M.D., MICHAEL AHDOOT, M.D., SHELDON PIKE, M.D., STEPHEN PERRONE, M.D., LAWRENCE BLUM, M.D., ANTHONY PACIA, M.D., MARK FRIEDMAN, M.D. TED DU, M.D. AND ROCKAWAYS ASC DEVELOPMENT, LLC, Defendants.

MARK GELWAN, M.D., IRA BACHMAN, M.D. ANTHONY HORVATH, M.D., MICHAEL AHDOOT, M.D., SHELDON PIKE, M.D., STEPHEN PERRONE, M.D., LAWRENCE BLUM, M.D., ANTHONY PACIA, M.D., MARK FRIEDMAN, M.D. TED DU, M.D. AND ROCKAWAYS ASC DEVELOPMENT, LLC, Third Party Plaintiffs,
against
URI KAUFMAN, Third Party Defendant.

705563/15

Leonard Livote, J.

The Court conducted a bench trial in this action on July 28, 2017 through August 9, 2017. Upon the evidence found to be credible, the Court renders the following Findings of Fact and Conclusions of Law.
Findings of Fact
Plaintiff is a New York limited liability company. Uri Kaufman is Plaintiff's manager. Kaufman is an attorney and real estate developer and is experienced in the rehabilitation and adaptive reuse of historic manufacturing and other commercial properties.
Defendant Rockaways ASC, LLC ("Defendant" or "Rockaways") is a New York limited liability company. Defendant Mark Gelwan, M.D. ("Gelwan") is an opthamologist and Rockaways' chief executive officer. The individual defendants are all physicians. Rockaways was organized by defendants to own and operate an Ambulatory Surgical Center ("ASC") operating under a Certificate of Need ("CON") issued by the New York State Department of Health ("DOH") pursuant to 10 NYCCRR 600, 710.
The "Rockaway Courthouse" is located at 90-01 Rockaway Beach Bivd., Rockaway, New York (the "Courthouse" or "Property"). The Courthouse was built around 1930 and was used as a [*2]municipal court. The Courthouse closed in 1962 and has been abandoned ever since. The Courthouse is approximately 30,000 sq. feet. The Courthouse was owned by the City of New York. Kaufman initiated efforts with the New York City Economic Development Corp. ("EDC") beginning in 1999 to acquire and develop the Courthouse for adaptive reuse.
Dr. Gelwan was affiliated with Peninsula Hospital in Rockaway, New York. Peninsula Hospital closed in January, 2012. Defendants anticipated the need for a healthcare facility in the Rockaway community upon Peninsula Hospital's closure. Defendants were interested in developing and operating an ASC to serve the Rockaway community. A CON authorizes an ASC operator to bill for both provider fees and facility fees. An ASC may operate without a CON, but if it does, then it may only bill "provider fees" and may not bill "facility fees". A provider cannot obtain a Certificate of Need without showing "need" for the facility in the proposed catchment area. That catchment area is defined as a radius of five to ten (10) miles. Defendants applied to DOH for a CON to operate an ASC at the Courthouse.
Defendants intended to operate a CON-licensed ASC. Gelwan undertook a search for a suitable location for an ASC in Rockaway. In the course of his search for a site at which to operate an ASC, Gelwan became aware of Kaufman's efforts to develop the Courthouse. Gelwan contacted Kaufman and proposed developing the Courthouse for use as an ASC.Kaufman and Gelwan agreed that the Courthouse was a promising and potentially suitable site for an ASC. Kaufman described to Gelwan his development experience and experience using historic tax credits to finance adaptive reuse developments. Kaufman advised Gelwan he had no prior development experience in the heath care field. Gelwan and Kaufman agreed to collaborate on a project for Kaufman to acquire the Courthouse from EDC in order to develop a portion for use as an ASC to be operated by Defendants with a CON issued by DOH.
By letter dated January 22, 2013 MacDonald, plaintiff's zoning expert, informed Kaufman that an ASC may be built in the Courthouse as of right under New York City's zoning laws.
On February 7, 2013 EDC and Plaintiff executed an agreement for Plaintiff's purchase of the Courthouse from EDC (the "EDC Contract"). The EDC Contract required Plaintiff to develop a portion of the Courthouse for use as an ASC operating under a CON.
On or about February 7, 2013 Defendant's application for a CON to operate an ASC was approved. Defendant advised DOH that the ASC would be operated at the Courthouse. The agreement with the DOH required that the ASC be completed by August 2014. On September 12, 2013, an amended and restated Contract between plaintiff and EDC was signed.
On or about August 13, 2013 Plaintiff, as landlord, and Rockaways, as tenant, executed the subject lease for approximately 13,000 sq. ft. on the first floor of the Courthouse (the "Lease"). Although referred to as a lease, this document also sets forth the parties responsibilities in developing the property. The relevant portions of the lease provide:
1. Plaintiff represented that the Property was zoned for use as a 13,000 sq. ft. ASC (Article 12.02(f));
2. Plaintiff was required to obtain title to the Courthouse from EDC on or before September 30, 2014 ("Title Acquisition Date")(Article 23.01);
3. There is no "time of the essence" provision for Plaintiff's acquisition of title.
4. Either party had the right to cancel the Lease on ten (10) days written notice if Plaintiff did not acquire title by the Title Acquisition Date (Article 23.01);
5. Kaufman provided a $400,000 limited guaranty of Defendant's "Tenant Project Costs" if the Lease was canceled pursuant to Article 23.01 ("Kaufman Guaranty").
6. The Lease provides an "Outside Date" of December 31, 2015 for Plaintiff to deliver the Property fit for "Tenant's Use" as an ASC. Article 1.08(d); Article 1.08(d) imposes financial penalties on Plaintiff as Landlord in the event of its failure to deliver the Property fit for Tenant's Use by the December 31, 2015.
7. Article 29.01 (restrictive covenant) prohibits Defendants from operating an ASC with a CON within a six (6) mile radius of the Courthouse. Article 29.02 applies, "at any time during the Term of this Lease and for a period of two (2) years immediately following the expiration or early termination of this Lease"; and
The project proceeded and, by email dated January 31, 2014, the architect informed defendants that the plans were 95% complete and would be completed when input from the DOH and final structural designs, which were to be completed by plaintiff, were complete.
However, the project soon ran into serious difficulties. On March 19, 2014 Kaufman received a call from MacDonald, his zoning expert, and was told by him that he had "made a mistake". MacDonald informed Kaufman that the ASC could not be built as of right because there was an existing zoning regulation that imposed a 1,500 sq. ft. limit on medical use of the Courthouse. Defendants elected not to cancel the Lease and to continue the project. The parties agreed that plaintiff would attempt to obtain a Mayoral override. By letter dated April 4, 2014, defendants informed plaintiff that it was in default of the lease due to the zoning issue and the failure to obtain financing as required by the EDC contract.
On July 8, 2014, the architect informed plaintiff that the construction plans could not be delivered because the defendants had not paid for the plans for the surgical center.
On July 11, 2014 Gelwan requested that Kaufman partner with Community Health Care Associates ("CHC"), an experienced ASC developer, to develop the Courthouse. Kaufman declined to partner with CHC. On July 25, 2014 Gelwan emailed Kaufman that all further discussions should be through legal counsel.
On August 18, 2014 Defendant filed an action (Queens County, Index No. 705563/15) demanding, inter alia, plaintiff's specific performance of the Lease and "equitable subrogation" to plaintiff's position as the contract vendee of the EDC Contract to purchase the Property. Defendants intent in filing the specific performance action was to replace Kaufman with CHC.
By Letter dated August 29, 2014, plaintiff informed defendants that they were in default by failing to provide the architectural drawings and obtain the CON. On September 11, 2014, defendants lost their financing for the project.
On September 30, 2014 Deputy Mayor Alicia Glenn issued the Mayoral Override of the existing zoning regulations. However, plaintiff did not obtain title to the Property on or before the September 30, 2014 Title Acquisition Date.
By letter dated October 7, 2014 Defendants indicated that they remained hopeful that the project would come to fruition, but "reserved" their right to cancel the Lease pursuant to Article 23.01.
On October 9, 2014, the architect informed plaintiff that the payment dispute with defendants had been resolved and the plans would be forthcoming.
On November 12, 2014, a meeting was held with Gelwan, Kaufman and the EDC. [*3]Gelman demanded (i)that Plaintiff be replaced as developer of the Property, (ii) that EDC default Plaintiff under the EDC Contract, and (iii) that EDC replace plaintiff with CHC. Kyle Kimble, president of EDC, declined to get involved.
On November 21, 2014 Defendant's counsel, Gary Fields, Esq., wrote to EDC's president and other representatives demanding "assurances" that, inter alia, "Kaufman will meet all obligations, including... payment of all penalties if... construction of the ...ASC has not been completed and the ASC operational by December 31, 2015 [the "Outside Date"] as called for under the premises.
On or about February 1, 2015 Gelwan negotiated and obtained a lease to operate an ASC at 105-08 Rockaway Beach, Rockaway, NY (the "Alternative Site"). Gelwan signed the lease dated February 1, 2015 for the alternative site later in 2015. On or about March 6, 2015, EDC conveyed title to the Courthouse to Plaintiff. On May 3, 2015 Defendants informed plaintiff that they had terminated the Lease pursuant to Article 23.01.
Conclusions of Law
As a threshold matter, the lease was based on a material, albeit innocent, misrepresentation that the premises had suitable zoning (see, Albany Motor Inn & Rest. v. Watkins, 85 AD2d 797, 798). A contract based on a misrepresentation is not void, but voidable (Davis v Gifford, 182 AD 99, 101 [1st Dept 1918]). "If a contract is voidable because of a misrepresentation and, before notice of an intention to avoid the contract, the facts come into accord with the assertion, the contract is no longer voidable unless the recipient has been harmed by relying on the misrepresentation (Restatement (Second) of Contracts § 165 (1981)).
In the instant case, defendants elected to proceed with the contract notwithstanding that it was entered into based on a material misrepresentation. When the mayoral override was granted, "the facts come into accord with the assertion," and the defendants lost their right to void the contract on the grounds that the zoning was misrepresented.
Section 23.01 of the lease, in relevant part states: "In the event that, following the Effective Date of this lease, Landlord shall not have obtained good, marketable and insurable title to the Building on or before September 30, 2014 (the "Title Acquisition Date"), either party shall have the right to cancel this lease upon ten (10) days notice to the other.
Defendants' letter dated May 3, 2015, purported to cancel the lease pursuant to section 23.01. On September 30, 2014, plaintiff had not acquired title and either party had the right to cancel the lease. Although 10 days notice is required, there is no requirement that the provision be exercised within a certain period of time.
Plaintiff argues that defendants waived their rights under this provision. "Contractual rights may be waived if they are knowingly, voluntarily and intentionally abandoned" (Fundamental Portfolio Advisors, Inc. v. Tocqueville Asset Mgt., L.P., 7 NY3d 96, 104; see Nassau Trust Co. v. Montrose Concrete Prods. Corp., 56 NY2d 175). "Such abandonment 'may be established by affirmative conduct or by failure to act so as to evince an intent not to claim a purported advantage' " (Fundamental Portfolio Advisors, Inc. v. Tocqueville Asset Mgt., L.P., 7 NY3d at 104, quoting General Motors Acceptance Corp. v. Clifton—Fine Cent. School Dist., 85 NY2d 232, 236; see Hadden v. Consolidated Edison Co. of NY, 45 NY2d 466, 469). "Generally, the existence of an intent to forgo such a right is a question of fact" (Fundamental Portfolio Advisors, Inc. v. Tocqueville Asset Mgt., L.P., 7 NY3d at 104; see Jefpaul Garage Corp. v. [*4]Presbyterian Hosp. in City of NY, 61 NY2d 442, 446).
By letter dated October 7, 2014, Defendants informed plaintiff that: "in light of the fact that Landlord has not obtained good, marketable and insurable title to the Building on or before September 30, 2014, this letter shall serve as formal notice to both Landlord and Uri Kaufman, as Guarantor, that Tenant hereby expressly reserves its right to cancel the lease at any time and receive reimbursement of the Tenant's Project Costs under Section 23.01 of the Lease, and that no action or inaction of Tenant or its representatives shall constitute a waiver of any such Tenant rights." Accordingly, this cannot be construed as a waiver. Defendants did engage in actions subsequent to September 30, 2014, including the continuation of the specific performance action and meeting with the EDC. However, these actions were taken with the intent of continuing the project with a different developer. Thus, they did not evince an intent to waive plaintiff's breach.
Plaintiff also argues that its delay in obtaining title was caused by the defendants' actions including the Notice of Claim filed against the EDC. As a general rule, "a party to a contract cannot rely on the failure of another to perform a condition precedent where he has frustrated or prevented the occurrence of the condition" (Kooleraire Serv. & Installation Corp. v Bd. of Ed. of City of New York, 28 NY2d 101, 106 [1971]). In the instant case, the plaintiff has failed to prove that any acts of defendants contributed to the delay in obtaining title.
Plaintiff also argues that the 30 day cure period contained in section 21.01 of the Lease precludes defendant's invocation of section 23.01. A specific clause in a contract takes precedence over a more general clause (Isaacs v Westchester Wood Works, Inc., 278 AD2d 184, 185 [1st Dept 2000]). "[A] written agreement that is complete, clear and unambiguous on its face must be enforced according to the plain meaning of its terms" (Greenfield v. Philles Records, 98 NY2d 562, 569 [2002]). The agreement must be "read as a whole to determine its purpose and intent" (W.W.W. Assoc., v. Giancontieri, 77 NY2d 157, 162 [1990]). "It is a cardinal rule of contract construction that a court should 'avoid an interpretation that would leave contractual clauses meaningless' " (150 Broadway NY Assoc., L.P. v. Bodner, 14 AD3d 1, 6 [1st Dept.2004]). Moreover, "conflicting contract provisions should be harmonized, if reasonably possible, so as not to leave any provision without force and effect ..." (Isaacs v. Westchester Wood Works, 278 AD2d 184, 185 [1st Dept.2000]). In the instant case, application of the 30 day cure period contained in section 21.01 would render the 10 day notice provision contained in section 23.01 meaningless. Accordingly, the 30 day cure period contained in section 21.01 does not apply to section 23.01.
Finally, plaintiff argues that the May 5, 2015 cancellation notice was ineffective because it did not provide 10 days notice. However, section 23.01 does not provide for a cure period. The 10 days only tolls the time in which the plaintiff must pay defendant's costs. Thus, the defendants' notification that the lease was being cancelled pursuant to section 23.01, was sufficient to incorporate the 10 day notice provision.
Turning to the application of these findings to the claims and counterclaims, the plaintiff's first cause of action is for anticipatory breach of contract.
"The essential elements for pleading a cause of action to recover damages for breach of contract are the existence of a contract, the plaintiff's performance pursuant to the contract, the defendant's breach of his or her contractual obligations, and damages resulting from the breach" (Dee v Rakower, 112 AD3d 204, 208—09 [2d Dept 2013]). However, as a general rule, "a party to [*5]a contract cannot rely on the failure of another to perform a condition precedent where he has frustrated or prevented the occurrence of the condition" (Kooleraire Serv. & Installation Corp. v Bd. of Ed. of City of New York, 28 NY2d 101, 106 [1971]). Plaintiff claims that the defendants prevented plaintiff from fulfilling its obligation to acquire title by September 30, 2014, by preventing the delivery of the architectural plans, commencing the specific performance action, and complaining to the EDC. However, plaintiff failed to prove that any of these actions caused its delay in acquiring title. Thus, defendants cancelled the contract pursuant to its express terms. Accordingly, there was no anticipatory breach of contract and plaintiff's first cause of action is dismissed.
Plaintiff's second cause of action is for specific performance pursuant to section 29.02 of the lease. Section 29.02 states:
"[t]enant and each of Tenant's members warrant, covenant, and agree that none of them individually, or in any combination, will seek to obtain a Certificate of Need for an ambulatory surgery center for a location within a six (6) mile radius of the Property, exclusive of the boroughs of Manhattan and the Bronx, at any time during the term of this Lease and for a period of two (2) years immediately following the expiration or early termination of this Lease."
Assuming that the cancellation on May 5, 2015 constitutes an "early termination," two years have already passed. Accordingly, this cause of action is moot.
The third and fourth causes of action seek enforcement of the defendants' guarantees. The fifth cause of action seeks contractual attorney's fees for the enforcement of the guarantees. Because the Court found for defendants on the underlying causes of action, these causes of action are dismissed.
The first counterclaim, alleging fraud, was dismissed by the Short Form Order of this Court dated April 7, 2017.
The second counterclaim alleges breach of contract. Defendants have established that plaintiff breached the contract by failing to obtain title to the premises on or before September 30, 2014 as required by section 23.01 of the Lease. Accordingly, the Court finds for the defendants on the second counterclaim.
The first cause of action in the third party complaint, alleging fraud, was dismissed by the Short Form Order of this Court dated April 7, 2017.
The second cause of action in the third party complaint against Kaufman alleges a breach of guarantee. In an action on a personal guarantee, a prima facie case is established through proof of (1) the guarantee; (2) a default on the underlying obligation secured by the guarantee; and (3) the defendant's failure to honor the guarantee (see e.g. Valencia Sportswear, Inc. v D.S.G. Enter., Inc., 237 AD2d 171 [1st Dept 1997]). In the instant case, defendants/third-party plaintiffs (Gelwan and Rockaways) failed to establish their case because the demand was made prior to any failure by plaintiff/third-party defendant (Kaufman) to honor the underlying obligation. Accordingly, the Court finds for the third-party defendants on this claim.
Damages.
The lease was terminated pursuant to section 23.01 which states:
"[i]n the event this lease is so terminated by either party, Landlord, within ten (10) days following such termination, shall pay to Tenant an amount equal to all actual costs and [*6]expenses incurred and paid by Tenant relating to the Property and/or Tenant's Use, including, but not limited to, applying for Tenant's Certificate of Need approval from the New York State Department of Health, retention of the Architect, bank financing and debt, legal, accounting, consulting, and other development expenses relating to Tenant's Use and development of the Property for Tenant's Use and development of the Property for Tenant's Use (collectively, "Tenant's Project Costs")."
It is conceded that defendants paid a $300,000 deposit for construction costs. This is recoverable as damages. Defendants have failed to prove any other claimed damages. Furthermore, interest shall be accessed from May 15, 2015, ten days after the notice of cancellation. Accordingly, it is,
Ordered, that the defendants shall recover on their counterclaim for breach of contract against plaintiff Harmony Rockaway LLC, the total sum of three hundred thousand dollars ($300,000), plus interest from May 15, 2015.
This constitutes the Decision and Order of the Court.
Settle Judgment.
Dated: November 27, 2017
........................
Leonard Livote, A.J.S.C.